**ESTATE OF Louis A. HICKS, Deceased, Appellee**

v.

**DANA COMPANIES, LLC f/k/a Dana Corporation, et al.**

**Appeal of: Dana Companies, LLC f/k/a Dana Corporation, Appellant.**

**Estate of Louis A. Hicks, Deceased, Appellee**

v.

**Dana Companies, LLC f/k/a Dana Corporation, et al.**

**Appeal of: John Crane, Inc., f/k/a Crane Packing, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 12, 2009.
Filed Nov. 18, 2009.

946

948

John De. Q. Briggs, Washington, DC, for Dana Corporation.

Edward M. Nass, Philadelphia, for Hicks.

Michael Pollard, Chicago, IL, for Crane.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, LALLY–GREEN *, KLEIN, BOWES, PANELLA, DONOHUE, and SHOGAN, JJ.

OPINION BY ORIE MELVIN, J.:

¶ 1 This is a consolidated appeal from the judgment entered against Appellants, Dana Companies, LLC f/k/a Dana Corporation (Dana) and John Crane, Inc., f/k/a Crane Packing (Crane), in this products liability action initiated by Appellee, the Estate of Louis A. Hicks, for his contracting malignant mesothelioma from alleged occupational exposure to the Appellants' asbestos-containing products. Following the denial of post-trial motions and entry of judgment, an appeal to this Court was filed in which a panel of this Court affirmed the trial court. We have granted reargument *en banc*, however, for the principal reason of determining the impact of the Supreme Court's decision in *Gregg v. V–J Auto Parts Company*, 596 Pa. 274, 943 A.2d 216 (2007). After review, we affirm.

¶ 2 The relevant facts and procedural history of this matter were aptly summarized by the trial court as follows:

The above captioned asbestos case was tried before the Honorable James Murray Lynn and a jury in a reverse bifurcated trial. Plaintiff decedent Louis A. Hicks initiated this lawsuit on December 23, 2002 seeking recovery for personal injuries sustained as a result of his work related exposure to asbestos. From 1948 to 1956, decedent worked as a laborer for Local Union # 135. From 1956 to 1989, decedent worked as a laborer for Heller & Karpowich. During the course of his employment, decedent

worked at various commercial industrial facilities throughout the Philadelphia area. Plaintiff decedent was a seventy-five year old man who was diagnosed with malignant mesothelioma in November of 2002. Mr. Hicks died on May 30, 2003; his daughter and administratrix of his estate, Denyse Hicks–Ray, continued this action on his behalf.

\* \* \*

In the first phase, the jury found that Plaintiff decedent was exposed to asbestos that resulted in his development of malignant mesothelioma and awarded his estate $5,000,000.00. In Phase II, the jury found eleven manufacturers of asbestos products liable for causing Plaintiff decedent's malignant mesothelioma, including Defendants, Dana [ ] and Crane. Each Defendant's pro rata share of the verdict was $454,545.45. On April 12, 2005, [the trial court] granted [Appellee's] Petition for Delay Damages, thereby molding the award [to] reflect[ ] a total amount of $464,605.65. [Dana and Crane each] timely filed a motion for post-trial relief that was denied. [This appeal followed.]

Trial Court Opinion, 10/24/07, at 1–2; Certified Record (C.R.) at 95.

■ ¶ 3 Upon initial review, a panel of this Court affirmed the judgment entered by the trial court against the Appellants in a Memorandum decision filed on July 22, 2008. Thereafter, on September 26, 2008, that Memorandum was withdrawn in this Court's *Per Curiam* Order which also granted Appellants' applications for reargument *en banc*.[1]

¶ 4 In their substituted brief on reargument *en banc*, Crane presents the following questions for this Court's review:

---

* Judge Lally–Green did not participate in the decision of this matter.

1. The Order further provided that each party shall either re-file the brief it had previously filed together with a supplemental brief, if desired, or prepare and file a substituted brief. All parties have chosen to do the latter. As such, we note that a panel of this Court

1. Whether John Crane is entitled to JNOV where [Appellee] failed to present sufficient evidence that gaskets and packings manufactured by John Crane were defective or were the factual cause of [Louis Hicks'] mesothelioma[?]

2. Whether evidence of Environmental Protection Agency ("EPA") and Occupational Safety and Health Administration ("OSHA") regulations should have been admitted, consistent with a Standing Order of the asbestos litigation master docket of the Philadelphia County Court of Common Pleas, to disprove causation, and whether the trial court erred in a series of evidentiary rulings related to this issue[?]

3. Whether the trial court's factual causation jury instructions improperly stated the law, and whether the factual causation instruction given by the trial court misled the attorneys and the jury, where the trial court instructed the jury on causation in a manner different from that contemplated by counsel and the trial court prior to closing argument[?]

Crane's brief, at 7.

 ¶ 5 Dana's brief on reargument *en banc* presents the following questions for our review:

1. Whether the causation instructions incorrectly stated the burden of proof?

2. Whether Dana is entitled to JNOV because a correctly instructed jury could not have found that Dana's gaskets caused Mr. Hicks' injuries?

3. Whether § 2 of the Restatement (3d) of Torts applies to this strict products liability action?

4. Assuming that Section 402A of the Restatement (2d) of Torts, rather than Section 2 of the Restatement (3d) of Torts, applies to this strict products liability action, whether the jury should have been instructed that "bystanders" can recover?

5. Whether the trial court erred in excluding evidence that Dana's products were in full compliance with applicable government and medical safety standards?

6. Whether conducting the trial in reverse-bifurcated format unfairly prejudiced Dana?

Dana's brief, at 4.[2]

In reviewing a motion for [JNOV], the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of

has concluded that on reargument, a petitioner may raise any issue in a supplemental or substituted brief that could have been raised before the original panel. *R.W.E. v. A.B.K.*, 961 A.2d 161, 171 (Pa.Super.2008). In doing so, the panel stressed that prior appellate court decisions indicate scope limitations on the issues to be considered are recognized when included either in a Supreme Court remand order or in this Court's order granting reargument. *Id.* The panel cited to *ABG Promotions v. Parkway Publishing, Inc.*, 834 A.2d 613, 615 n. 2 (Pa.Super.2003), wherein this Court considered only those issues designated by it in the order granting *en banc* review and to Pa.R.A.P. 2546(b) in support of

this statement. Herein, this Court did not designate any specific issue in granting *en banc* review, rather, we merely directed the parties to address the applicability of our Supreme Court's decision in *Gregg, supra*, which was decided after the completion of briefing and oral argument in this appeal. Therefore, we will consider each of the Appellants' issues as presented in their substituted briefs on reargument *en banc* if it has been properly preserved.

2. The trial court did not direct the filing of a statement of matters complained of on appeal pursuant to the version of Pa.R.A.P. 1925(b) then in effect.

every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, a [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

There are two bases upon which a [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Fletcher–Harlee Corp. v. Szymanski*, 936 A.2d 87, 93 (Pa.Super.2007), *appeal denied*, 598 Pa. 768, 956 A.2d 435 (2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 1581, 173 L.Ed.2d 675 (2009) (quoting *Moure v. Raeuchle*, 529 Pa. 394, 402–403, 604 A.2d 1003, 1007 (1992) (citations and quotation marks omitted)).

Similarly, when reviewing the denial of a motion for new trial, we must determine if the trial court committed an abuse of discretion or error of law that controlled the outcome of the case.

*Id.* (quoting *Long v. Mejia*, 896 A.2d 596, 599 (Pa.Super.2006) (citations omitted)).

■ ¶ 6 With these standards in mind, we examine Crane's first issue on appeal wherein it argues that it is entitled to JNOV because no two reasonable minds could fail to agree that "the expert testimony on causation and the testimony on frequency, regularity and proximity overwhelmingly favor John Crane." Crane's brief, at 16. Specifically, Crane takes issue with the opinion offered by Appellee's expert, Dr. James C. Giudice, which indicated that each and every exposure to asbestos is significant in the causation of mesothelioma because each and every exposure adds to the asbestos burden. Videotaped Deposition of Dr. Giudice, 6/8/04, at 29; C.R. at Exhibit P–6. Crane argues that the Supreme Court's reference in *Gregg, supra*, to similar "generalized" opinions being insufficient to establish a jury question should likewise be insufficient to overcome the allegedly unrebutted contrary testimony of Appellants' expert witnesses that there is a *de minimis* release of respirable asbestos fibers from the Crane products at issue. Dana, in its second issue, advances a similar argument positing that "the Supreme Court [has] rejected the ... 'each and every exposure to asbestos' theory ... as insufficient as a matter of law to satisfy Pennsylvania's causation standards." Dana's Brief, at 15.[3] We disagree.

■ ¶ 7 To prove causation in fact in § 402A asbestos cases, the plaintiff must prove medical causation, *i.e.*, that exposure to asbestos caused the injury and that it

---

**3.** Appellants have preserved their right to seek a JNOV by making an oral motion for directed verdict at the close of all the evidence presented. N.T. Trial Volume 7, 6/22/04, at 94–95, 98; *see also* Pa.R.C.P. 227.1(b)(1); *Hayes v. Donohue Designer Kitch-* en, *Inc.*, 818 A.2d 1287, 1291 n. 4 (Pa.Super.2003) (stating "cases indicate that in order to preserve the right to request a JNOV post-trial[,] a litigant must first request a binding charge to the jury or move for directed verdict at trial.").

was the defendant's asbestos-containing product which caused the injury. To satisfy this burden a plaintiff must meet the "regularity, frequency and proximity" test as articulated by our Supreme Court in *Gregg, supra*. In *Gregg,* our Supreme Court explained for the first time the appropriate application of the "frequency, regularity and proximity" criterion this Court announced in *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1988), *appeal denied*, 520 Pa. 605, 553 A.2d 968 (1988). In so doing, the Supreme Court adopted the approach utilized by the United States Seventh Circuit Court of Appeals in the case of *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir.1992), explaining that there is no bright-line distinction between direct and circumstantial evidence cases "because this distinction is unrelated to the strength of the evidence and is too difficult to apply, since most cases involve some combination of direct and circumstantial evidence." *Gregg,* at 290, 943 A.2d at 226 (footnote omitted). More specifically, the Supreme Court opined:

> *Tragarz* explains that these criteria do not establish a rigid standard with an absolute threshold necessary to support liability. Rather, they are to be applied in an evaluative fashion as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product. Further, *Tragarz* suggests that the application of the test should be tailored to the facts and circumstances of the case, such that, for example, its application should become "somewhat less critical" where the plaintiff puts forth [direct rather than only circumstantial] evidence of exposure to a defendant's product. Similarly, under *Tragarz,* the frequency and regularity prongs become "somewhat less cumbersome" in cases involving diseases [like mesothelioma] that the plaintiff's competent medical evidence indicates can develop after only minor exposures to asbestos fibers.

*Gregg,* at 290, 943 A.2d at 225 (internal citations omitted). In summation, the Supreme Court noted:

> [W]e believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Id.* at 292, 943 A.2d at 227.

¶ 8 Our review of the record in the case *sub judice* reveals that sufficient evidence was presented that Appellants' products were causally connected to Mr. Hicks' injury. We find the evidence met the flexible standard adopted by the Pennsylvania Supreme Court in *Gregg, supra,* a standard that directs courts to "tailor the standard to the facts and circumstances in the case." *Id.* at 290, 943 A.2d at 225. Clearly, Appellee established that Mr. Hicks worked frequently or on a regular basis in close proximity to asbestos-containing products manufactured or supplied by Dana and Crane. Specifically, Mr. Hicks provided direct evidence through his testimony that throughout the course of his forty-one-year career as a construction laborer, he was exposed to asbestos-containing gaskets and asbestos-containing rope packing, which were the types of asbestos-containing products manufactured by the Appellants herein. Videotaped Deposition of Louis Hicks, 1/21/03, at 18–33, 50–53, 70–73; C.R. at Exhibit P–3. With respect to

asbestos-containing gaskets, Mr. Hicks stated that he worked closely with pipe fitters who used asbestos gaskets which went into the flange of the pipe. Mr. Hicks stated that the gaskets had to be cut for the flange, and dust was created from this process. *Id.* at 22–23, 70–73. Mr. Hicks identified the manufacturers of the gaskets as Dana and Crane, as well as Chesterton and Palmetto, who are not parties to this appeal. *Id.* at 89–90. He testified that he used all four brands equally throughout his forty year career. *Id.* at 90. Mr. Hicks testified he worked around pipe fitters who were installing gaskets "most of the time" during the course of his career as a laborer. *Id.* at 89. Mr. Hicks also indicated that he personally handled all four manufacturers' gaskets. Mr. Hicks explained that he had to handle the gaskets because of his role as a pipefitter's helper. *Id.* at 90–91, 94–96. Mr. Hicks knew that Dana and Crane's gaskets contained asbestos because the word asbestos was on the packaging that the gaskets came in. *Id.* at 90–91, 95. Mr. Hicks testified that Dana's and Crane's gaskets came in both pre-cut form and in sheet form. *Id.* at 92–93, 95. Mr. Hicks testified that dust was created when the Dana and Crane gaskets were cut, and he frequently breathed in the dust from the gaskets. *Id.* at 93–98. Mr. Hicks explained that the asbestos sheet gaskets had to be cut to fit the flange. *Id.* at 93. Dust was also created from the pre-cut gaskets. Mr. Hicks explained that dust was created when the pre-cut gaskets were taken out of the carton, and dust was created when the gaskets were installed into the flanges of the pipe systems. *Id.* at 94–95. Mr. Hicks also indicated that he was exposed to and inhaled that dust. *Id.*

¶ 9 Mr. Hicks further testified that the rope packing was used by plumbers and pipefitters for packing joints. *Id.* at 22–23. Mr. Hicks testified that he breathed in the dust which was created from the rope packing because the rope would have to be cut to length in order to fit around the pipe. *Id.* Mr. Hicks identified the manufacturers of the asbestos rope packing as Crane, as well as Chesterton and Palmetto. *Id.* at 102. Mr. Hicks gave the following description of this packing: "It's a rope. It comes in a box with packing. And so they have to untangle it and get the amount of what they are going to use at a time. And there's dust in it when they cut it." *Id.* at 100. Mr. Hicks testified that he worked around plumbers who were packing joints with asbestos rope for almost his whole career in construction. *Id.* at 101. Mr. Hicks also personally handled the rope packing, and he assisted the plumbers in installing the rope packing. *Id.* When asked how often he worked around Crane asbestos rope packing during his career, Mr. Hicks testified "Most of my career in the [sic] construction." *Id.* at 102. Mr. Hicks also testified that Appellants' asbestos products did not contain warning labels on them. *Id.* at 52–53, 110–111.

¶ 10 Additionally, Appellee's expert, Dr. James C. Giudice, a physician who is board certified in internal medicine and pulmonary medicine, testified, in relevant part, as follows:

Q: Doctor, among those three major types of asbestos fiber that you've just told the Jury about, the chrysotile, the crocidolite and the amosite, which one of those fibers are potentially dangerous or hazardous to human health?

A: All three. All three are potentially dangerous and certainly hazardous to the health of people exposed to them.

Q: And among those three types of asbestos fibers, the chrysotile, crocidolite and amosite, which ones are potential cancer-causing agents?

A: All three. All three are carcinogens. All three can cause cancer.

Videotaped Deposition of Dr. Giudice, 6/8/04, at 13–14; C.R. at Exhibit P–6.

* * *

Q: Doctor, are products that contain asbestos, are those products potentially dangerous if fibers are released from those products into the air?

A: Yes.

*Id.* at 17.

* * *

Q: Doctor, is there any way to make asbestos fibers themselves safe or non-dangerous to human health?

A: No. It's not possible to—to make asbestos safe.

Q: Is there any way to make the asbestos fibers that go into the products themselves, those asbestos fibers, safe or non-dangerous to human health?

A: No, it's not possible to make them safe by placing them into products. They're still capable of causing disease.

Q: Doctor, what does the medical phrase dose response mean, and how does that relate at all to asbestos-related diseases?

A: Well, dose response simply stated means that the higher amount of a substance is present in a system or a body, the—the increased incidence of the damage or disease that can result from that substance. And to apply that to asbestos, the more asbestos that accumulates within the lungs, for example, the more disease that results from that accumulation, that's known as a dose-response curve. It's also described as a—as a linear relationship between asbestos which is the injury-forming substance causing disease and the disease that results from that—that material. As one—as the collection goes up and the amount of asbestos accumulates, the dis-ease that results from that accumulation also increases in incidence. And so, that that is the dose-response curve or linearity. In terms of asbestos-related diseases, they all essentially exhibit this dose-response relationship, which means that the incidence of a specific disease associated with asbestos will, in fact, increase as the amount of asbestos accumulates and increases in the human body.

Q: What about specific to malignant mesothelioma?

A: Well, specifically to malignant mesothelioma, it does hold true, the more asbestos, the more likely that specific malignancy will, in fact, occur and the incidence increases. The problem with mesothelioma is the lower threshold below which exposure is judged to be safe that has never been defined. There is no lower threshold that's been clearly identified within the workplace that would protect the worker from asbestos exposure in the development of a malignant mesothelioma.

Q: Doctor, if an individual has been exposed to asbestos for say a hundred days, and then is exposed to asbestos an additional day, the 101st day, what, if any, effect does that additional day's exposure to asbestos have on that person's risk of developing an asbestos-related disease?

THE WITNESS: It increases the risk. If it increases the asbestos burden, it increases the risk because of the dose-response relationship I've just discussed, this linearity between the amount of asbestos and disease that results from the asbestos is determined by the amount that accumulates, as I stated, and a hundred and one days is—is more than a hundred. And, as a result, the asbestos amount accumulating increases and the

disease that results is also increased or at least the incidence of that disease.

Q: Doctor, what is meant by the term cumulative disease?

A: Well, that's another term for what I've just described. It's—an accumulative asbestos burden is another expression of the dose-response relationship and the linear relationship between the asbestos accumulation in the body and diseases that result from that accumulation.

Q: Doctor, if an individual has developed malignant mesothelioma as a result of exposure to asbestos, will you tell the members of the Jury in your professional opinion to a reasonable degree of medical certainty what the relationship is between each and every inhalation of asbestos that that person had during the course of their lifetime and the development of that malignant mesothelioma?

THE WITNESS: It's my opinion that each and every exposure is significant in the causation of this malignancy, mesothelioma, by the asbestos. And the reason that each and every exposure is significant is that each and every exposure adds to the asbestos burden. And, as—has been—as I've described previously, the more asbestos that accumulates, the more significant or the risk for mesothelioma and the higher incidence of that malignancy. That's one thing we do know. We do know that the more asbestos that collects, the more—more significant the incidence—the number of mesotheliomas will increase. What we don't know is how that occurs. And so, each and every asbestos fiber that's inhaled contributes to the asbestos burden—that contributes to the asbestos burden is a causative factor in the development of this malignancy.

Q: Doctor, if an individual who has developed malignant mesothelioma as a re-

sult of exposure to asbestos has been exposed to the fibers from various types of asbestos-containing products throughout his or her lifetime, do you have an opinion that you hold to a reasonable degree of medical certainty as to the relationship between each and every exposure to each one of those products and the subsequent development of their malignant mesothelioma?

A: Yes. I have an opinion which I hold to a reasonable degree of medical certainty that the asbestos that's contained in each and every product that was inhaled by an individual who developed a malignant mesothelioma was contributory in a substantial fashion causally to the development of the mesothelioma because of the increased asbestos burden that results from that type of exposure.

\*　　\*　　\*

Q: All right. And Doctor, is there anything about Mr. Hicks' situation in terms of his exposure to asbestos and the development of his malignant mesothelioma that would take him out of the general princip[le]s that you have just been telling the members of the Jury about?

A: No.

*Id.* at 19–31.

¶ 11 Specifically, with respect to Mr. Hicks, and after taking into consideration the asbestos exposure Mr. Hicks testified to and the types of asbestos-containing products Mr. Hicks was exposed to, Dr. Giudice opined that they were a substantial contributing factor to the development of Mr. Hicks' malignant mesothelioma. *Id.* at 31–33. Dr. Giudice explained that, "the burden of asbestos that collected because of those exposures collectively resulted in a higher incidence of a risk for cancer, and [Mr. Hicks] went on to develop

mesothelioma because of the increased risk developed from that type of exposure over a rather significant period of time." *Id.* at 33. Moreover, Dana's experts, John W. Spencer, a certified industrial hygienist and certified safety professional, and Dr. Gerald R. Kerby, M.D., corroborated some of the Appellee's expert's testimony. For instance, Mr. Spencer acknowledged on cross-examination that Dana's gaskets give off some respirable fibers of asbestos. N.T. Trial Volume 6, 6/21/04, at 39–40 (stating: "[i]t is a product, even at 85 percent asbestos in the gasket, because of capsulation due to the rubber, it gives off extraordinarily low levels of asbestos, if any at all."). On the issue of whether Dana's gaskets are capable of causing disease through dust emissions, Mr. Spencer admitted that in 1985, Dana put a warning label on their asbestos-containing gaskets which said, "this material contains asbestos, avoid creating dust, inhalation may cause asbestosis or other serious bodily harm." *Id.* at 40. Dr. Kerby acknowledged on cross-examination that mesothelioma is a dose response cancer to the extent that "you have to inhale enough fibers to cross the threshold. So once you cross the threshold, additional doses affect the incidence slightly but not greatly." N.T. Trial Volume 4, 6/17/04, at 50. Dr. Kerby admitted that mesothelioma develops at a lower dose level than asbestos-related fibrosis and asbestos-related lung cancer. *Id.* at 73, 96. Dr. Kerby agreed that Mr. Hicks had accumulated enough asbestos fibers in his lungs to contract mesothelioma and die from the disease. *Id.* at 97.

¶ 12 Crane's expert, Henry L. Buccigross, a chemical engineer, initially testified on direct examination that Crane's gaskets and packing products do not release asbestos fibers because they are not friable and are encapsulated. N.T. Volume 5, 6/18/04, at 55–56, 60. However, on cross examination, Mr. Buccigross conceded that Crane's asbestos products do give off some asbestos fibers, although maintaining that it is "next to nothing" in that the packings release, at most, 1/100,000th as many fibers by comparison to other products like insulation. *Id.* at 102–103. Dana's experts testified in a similar manner opining that asbestos fibers below a threshold of .1 fibers per cubic centimeter (f/cc) cause no adverse health effects, N.T. Trial Volume 4, 6/17/04, at 107–108, and that gaskets release only very small amounts of chrysotile asbestos fibers. *Id.* at 102–103. On the issue of whether Crane's asbestos-containing products are capable of causing disease through dust emissions, Mr. Buccigross likewise acknowledged on cross-examination that he was aware that Crane placed a warning label on its asbestos-containing products that stated, "Caution: contains asbestos fibers. Avoid creating dust. Breathing asbestos dust may cause serious bodily harm." N.T. Trial Volume 5, 6/18/04, at 72–73.

¶ 13 The record evidence clearly presents conflicting expert opinions on causation, Appellee's expert states that "[t]here is no lower threshold that's been clearly identified within the workplace that would protect the worker from asbestos exposure in the development of a malignant mesothelioma," Videotaped Deposition of Dr. Giudice, 6/8/04, at 23, while Appellants' experts submit that mesothelioma only develops with exposure to concentration levels of asbestos fibers above a threshold of .1 f/cc, and their products did not emit concentration levels above .009 f/cc. N.T. Trial Volume 4, 6/17/04, at 107–108. Consequently, what we have in this case is the proverbial "battle of the experts" common to most tort litigation, and which is not properly subject to the grant of JNOV. *See Fletcher–Harlee Corp., supra,* (stating "the

evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor."); *see also, Cauthorn v. Owens Corning Fiberglas Corp.,* 840 A.2d 1028, 1033, 1038–1039 (Pa.Super.2004) (holding that the jury was free to disregard defendant's expert testimony that the product emitted levels of respirable asbestos too low to be harmful); *Junge v. Garlock, Inc.,* 427 Pa.Super. 592, 629 A.2d 1027, 1029–1030 (1993) (holding that a plaintiff establishes a *prima facie* case by showing that he or she frequently, regularly and proximately inhaled asbestos fibers shed by the defendant's product even where the defendant presents "unrebutted" expert reports contending that the defendant's "encapsulated" product could only emit a level of asbestos too low to have been a substantial factor in causing the plaintiff's asbestos-related disease). From our review of the record, we cannot conclude that the evidence was such that a verdict for the Appellants was beyond peradventure. *Id.*

¶ 14 Appellants' arguments attempt to equate a *de minimis* exposure under the frequency, regularity, and proximity test, articulated by our Supreme Court in *Gregg,* with a *de minimis* release of respirable fibers to defeat a *prima facie* showing of causation. Contrary to Crane's and Dana's arguments, we do not find that Appellee's expert's so-called "generalized" opinion in this case contravenes the substantial-factor test for causation as stated in *Gregg.* As we construe these arguments, the medical opinion that "each and

every breath" contributed to cause Mr. Hicks' disease should be rejected as a matter of law because it would allow plaintiffs to recover after establishing exposure to only very small amounts of asbestos fibers as opposed to a substantial number of fibers. We believe this is an overly expansive reading of the holding in *Gregg.* We note, as the *Tragarz* court made clear,

> the substantial factor test is not concerned with the **quantity** of the injury-producing agent or force but rather with its **legal significance.** . . . Where there is competent evidence that one or a *de minimis* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury.

*Tragarz,* 980 F.2d at 421 (quoting *Wehmeier v. UNR Industries, Inc.,* 213 Ill. App.3d 6, 31, 157 Ill.Dec. 251, 572 N.E.2d 320 (Ill.App.Ct. 4th Dist.1991)). The plaintiff's medical expert in *Tragarz* gave similar testimony to that of Dr. Giudice noting that "even a minimal exposure to asbestos can induce or contribute to the development of mesothelioma" and "that there is no level of asbestos exposure at which a person is safe from contracting mesothelioma." *Id.*

¶ 15 We can discern nothing in the *Gregg* decision mandating that the medical evidence presented by Appellee herein is automatically insufficient to raise a factual question of causation. Rather, we find that the majority's pronouncement in *Gregg* that they share the "perspective" of our esteemed colleague Judge Klein must be viewed in the context of the facts of each case.[4] In *Gregg,* the case proceeded

---

4. In *Summers v. Certainteed Corp.,* 886 A.2d 240, 244 (Pa.Super.2005) (evenly divided *en banc* opinion in support of affirmance), *appeal granted,* 587 Pa. 699, 897 A.2d 460 (2006), Judge Klein, in making his point that

the proffered evidence could not survive summary judgment in that case, noted:

> Just because a hired expert makes a legal conclusion does not mean that a trial judge has to adopt it if it is not supported by the record and is devoid of common sense.

on the theory that plaintiff's decedent died of mesothelioma due to exposure to asbestos-containing brake products purchased at the defendant's auto parts store for his personal automotive maintenance activities. The evidence, at most, showed that the decedent "installed asbestos-containing brakes purchased from [defendant's] store on three occasions over a five-year period, and that he was exposed to airborne fibers for less than thirty minutes each time that he installed new brake shoes." *Gregg*, at 283, 943 A.2d at 221. Plaintiff had also made averments in the complaint that the decedent was exposed to asbestos throughout his forty-year work history.

¶ 16 Here, unlike in *Gregg*, we are not confronted with a plaintiff asserting a relatively few non-occupational contacts with a defendant's product for short periods of time in comparison with a lengthy period of occupational exposures to some other asbestos products. Rather, we have the converse, a forty-year occupational exposure to each of Appellants' products as well as other products. Much like the plaintiff's decedent in *Tragarz*, who died of mesothelioma after a twenty year career as a steel metal worker who often worked alongside insulators and pipefitters who installed and cut asbestos containing products, Mr. Hicks spent forty-one years working alongside plumbers and pipefitters who were installing and cutting Appellants' products in his capacity as a laborer for an excavation company. This is not the casual or minimal exposure case relative to some other substantial exposure as highlighted in the Supreme Court's comments concerning Judge Klein's perspective.

¶ 17 It is also important to note that the facts in *Summers* were vastly different from the instant case. One of the plaintiffs, Mr. Summers, was diagnosed as having "asbestos pleural disease" which had been stable for a number of years and a significant obstructive disease from his long history of cigarette smoking. Consequently, the trial court granted summary judgment in favor of the asbestos defendants because pleural thickening is asymptomatic and due, to Mr. Summers' litany of other problems, it was impossible to say that any discernable symptoms were attributable to asbestos. It was in this context that Judge Klein criticized the viability of Mr. Summers' expert's opinion, which stated:

> In my opinion, to a reasonable degree of medical certainty, exposure to asbestos in the workplace is the cause of the asbestos pleural disease and is a substantial contributing factor to his diffusion abnormality and to his dyspnea on exertion. Each and every exposure to asbestos has been a substantial contributing factor to the abnormalities noted.

*Summers*, 886 A.2d at 244.

¶ 18 The instant case is more than an "any exposure" or trivial exposure type case as analogized by Judge Klein under the facts presented in *Summers* and now improperly relied upon by Appellants under the facts presented in this case. In *Summers*, Judge Klein aptly noted the

For example, Dr. Gelfand [the plaintiff's expert] used the phrase, "Each and every exposure to asbestos has been a substantial contributing factor to the abnormalities noted." However, suppose an expert said that if one took a bucket of water and dumped it in the ocean, that was a "substantial contributing factor" to the size of the ocean. Dr. Gelfand's statement saying every breath is a "substantial contributing factor" is not accurate. If someone walks past a mechanic changing brakes, he or she is exposed to asbestos. If that person worked for thirty years at an asbestos factory making lagging, it can hardly be said that the one whiff of the asbestos from the brakes is a "substantial" factor in causing disease.

incongruity of blaming a single brake job for plaintiff's mesothelioma when he was a lifelong insulator. The Supreme Court in *Gregg* similarly recognized this incongruity in questioning why plaintiffs were trying to take a brake parts supplier to trial when the complaint alleged a forty-year history of occupational exposure. Here, however, we are not confronted with evidence that Mr. Hicks experienced only "one whiff of the asbestos" from the Appellants' products in comparison to "thirty years [of exposure] at an asbestos factory making lagging." Just the opposite, this is the case of occupational exposure for forty years. Furthermore, there is no indication in this case that Appellee's expert ignored far more significant exposures that almost certainly caused the disease that were not being sued upon in this cause of action. We do not read *Gregg* as precluding an expert from opining that Mr. Hicks' mesothelioma resulted from the cumulative effect of repeated, low-level exposures over a forty-year work history.

 ¶ 19 Instead, we read *Gregg* as recognizing that the amount of evidence needed to satisfy the frequency, regularity and proximity test so as to survive summary judgment will differ from case to case due to the various diseases which are associated with asbestos exposure, the medical evidence presented, the types of asbestos involved, the manner in which the products are handled, and the tendency of those asbestos products to release asbestos fibers into the air. It is important to keep in mind that the admissibility of Dr. Giudice's opinion has not been challenged by Appellants in this appeal.[5] Thus, it must be considered in the light most favorable to Appellee as the verdict winner, who receives the benefit of every reasonable inference of fact arising from the evidence, and that any conflict in the evidence must be resolved in the verdict-winner's favor. *Fletcher–Harlee Corp., supra.* Here, Appellee presented evidence that Mr. Hicks inhaled dust shed by Appellants' asbestos-containing gaskets and packing over a substantial period of time. Appellee further presented evidence that this cumulative exposure, even if only at low-dose levels each time, was a substantial contributing factor in his development of malignant mesothelioma. Thus, no basis for entering JNOV exists, and Appellants' multi-layered argument attacking the sufficiency of Appellee's evidence, which in essence is merely an assertion that judgment should have been entered based on the evidence favorable to them, is completely devoid of merit.

¶ 20 Moreover, we take issue with Crane's assessment that our Supreme Court in *Gregg* principally relied upon the decision of the Court of Appeals for the Sixth Circuit in *Lindstrom v. A–C Product Liability Trust*, 424 F.3d 488 (6th Cir. 2005), in announcing the frequency, regularity and proximity test, and ergo, a casual or minimal exposure equates with "low-dose exposures." Crane's Reply Brief, at 6. The Supreme Court merely referenced *Lindstrom* as an example of one of the many courts that believed as it does that the frequency, regularity and proximity "criteria should have broader application

---

**5.** We recognize that many of Appellants' arguments challenging Appellee's expert's opinion are premised upon the underlying belief that because their products were allegedly encased or encapsulated plaintiff's expert should be required to assess the dose from an individual defendant's product or workplace and demonstrate that it is the kind of dose shown in established epidemiology studies to be capable of causing disease. Whether or not a pretrial challenge on that basis is appropriate is not before us in this appeal, and *Gregg* did not address that issue. We express no opinion in this case on the ultimate resolution of that issue.

in the courts' assessment of the sufficiency of a plaintiff's proofs." *Gregg,* at 298–290, 943 A.2d at 225. The *Lindstrom* case simply reiterated the Sixth Circuit's standard announced in *Stark v. Armstrong World Indus., Inc.,* 21 Fed.Appx. 371, 375 (6th Cir.2001), which required a plaintiff to show "substantial exposure for a substantial period of time" and not merely "minimal exposure" to a defendant's product to provide a basis for the inference that the product was a substantial factor in causing the injury. *Id.* at 376.

¶ 21 In *Stark,* the plaintiff had shown exposure to the defendants' asbestos products on a very limited basis for less than two months. 21 Fed.Appx. at 381. Such evidence, reasoned the Sixth Circuit, failed to rise to the level of **"substantial** exposure for a **substantial** period of time." *Id.* (emphasis added). Further, the court noted that the plaintiff had failed to submit any expert testimony that his exposure to the defendants' products had been hazardous. Indeed, the court expressly stated: "Had [the plaintiff] presented expert testimony to show that cleaning a boiler even once (or perhaps a few times) is sufficiently hazardous to add a meaningful level of cancer risk, summary judgment might well have been improper." *Id.* (Emphasis added.) *Lindstrom,* likewise, did not present a situation of low-dose exposure over a long period of time. Consequently, neither, *Stark, Lindstrom* nor *Gregg,* equated low-dose exposure over a long period of workplace exposure with "minimal exposure." In any event, the fact remains that our Supreme Court in *Gregg* did not adopt the *Stark* "substantial exposure for a substantial period of time" standard. Quite the contrary, as previously explained, the *Gregg* majority specifically "agree[d] with the *Tragarz* court's approach [that applied a flexible standard] and adopt[ed] it." *Gregg,* at 290, 943 A.2d at 226.

¶ 22 Consequently, we conclude that, viewing the factual exposure evidence and the expert medical evidence in the light most favorable to Appellee and rejecting all contradictory evidence, it cannot be said as a matter of law that Appellee's proofs were insufficient to support the verdict. The evidence adduced by Appellee was sufficient under the applicable *Gregg* test to permit the jury to infer that Mr. Hicks contracted mesothelioma caused by breathing, in his work place over a lengthy period of time, asbestos fibers from products manufactured by Appellants, and, therefore, Appellants were not entitled to a JNOV.

¶ 23 Additionally, Crane asserts that Appellee's evidence was insufficient because Mr. Hicks failed to establish that he was exposed to Crane products. In this regard, Crane complains that Mr. Hicks' description of the packaging of those products conflicted with the testimony of Mr. McKillop, Crane's product manager. Crane asserts that Mr. McKillop's testimony "demonstrates that Mr. Hicks described products that do not exist, and never have, in John Crane's product line." Crane's brief, at 21. We cannot agree.

¶ 24 As Appellee correctly points out, this claim is one of weight for the jury and has no bearing on the issue of legal sufficiency. Indeed, "[t]he weight and credibility of [Appellee's] evidence is for the jury to determine. Conflicts in the evidence [a]re for the jury to resolve." *Juliano v. Johns–Manville Corp.,* 416 Pa.Super. 321, 611 A.2d 238, 240 (1992), *appeal denied,* 533 Pa. 645, 622 A.2d 1376 (1993). *See Hershey v. Pittsburgh & West Virginia Railway Co.,* 366 Pa. 158, 76 A.2d 379 (1950) (noting that JNOV cannot be entered for a defendant based solely on his oral exculpatory evidence because the jury may properly disbelieve such evidence but upholding grant of new trial on basis that

the verdict was against the weight of the evidence was in the exercise of the sound discretion of the trial court), *Andaloro v. Armstrong World Industries, Inc.,* 799 A.2d 71, 87 (Pa.Super.2002) (rejecting similar argument by Crane for same reason), and *Martin v. Evans,* 551 Pa. 496, 505, 711 A.2d 458, 463 (1998) (citation omitted) (stating "A jury is entitled to believe all, part or none of the evidence presented.... A jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve."). Instantly, Appellants did not preserve a weight of the evidence challenge. Therefore, we offer no opinion on whether a new trial would have been appropriately granted on this basis.

¶ 25 In Crane's next issue, and in Dana's fifth issue, Appellants assert that the trial court erred in precluding evidence of government safety standards to disprove defect or causation. With respect to the admission of evidence, we observe:

Admission of evidence is within the sound discretion of the trial court and we review the trial court's determinations regarding the admissibility of evidence for an abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. For evidence to be admissible, it must be competent and relevant. Evidence is competent if it is material to the issue to be determined at trial. Evidence is relevant if it tends to prove or disprove a material fact. Relevant evidence is admissible if its probative value outweighs its prejudicial impact. The trial court's rulings regarding the relevancy of evidence will not be overturned absent an abuse of discretion.

*Conroy v. Rosenwald,* 940 A.2d 409, 417 (Pa.Super.2007) (quoting *American Future Systems, Inc. v. Better Business Bureau,* 872 A.2d 1202, 1212 (Pa.Super.2005), *affirmed,* 592 Pa. 66, 592 Pa. 66, 923 A.2d 389 (2007), *cert. denied,* 552 U.S. 1076, 128 S.Ct. 806, 169 L.Ed.2d 606 (2007) (internal citations omitted)). Additionally, "[e]videntiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Callahan v. AMTRAK,* 2009 PA Super 132, ¶ 8, 979 A.2d 866 (Pa.Super.2009) (quoting *Betz v. Erie Ins. Exchange,* 957 A.2d 1244, 1258 (Pa.Super.2008) (citations and quotation marks omitted)).

¶ 26 Appellants next question whether the trial court properly excluded Appellants' evidence of government standards relating to the levels of asbestos exposure in the workplace that are considered permissible under OSHA and EPA regulations. Appellants submit that, at a minimum, these regulations were relevant and admissible to prove that their products were not the factual cause of Mr. Hicks' injury. Moreover, Appellants submit that most jurisdictions have determined that such standards are admissible in strict liability actions for the purpose of proving lack of defect. Appellants further maintain that there is a split of authority in Pennsylvania concerning whether government standards are admissible to disprove defect as represented by this Court's panel decisions in the cases of *Jackson v. Spagnola,* 349 Pa.Super. 471, 503 A.2d 944 (1986), *appeal denied,* 514 Pa. 643, 523 A.2d 1132 (1987), and *Sheehan v. Cincinnati Shaper Co.,* 382 Pa.Super. 579, 555 A.2d 1352 (1989), *appeal denied,* 523 Pa. 633, 564 A.2d 1261 (1989), and that this *en banc* Court should therefore resolve the matter by overruling *Sheehan.* More specifically, Dana asserts that *Sheehan* was wrongly decided because government standards, unlike industry standards, "do **not** address the manufacturer's level of care.

Rather, they address whether the **product itself** is defective." Dana's Reply Brief at 13. Moreover, they point out that these standards are even more appropriate in this asbestos case in light of the Standing Order entered on the asbestos litigation master docket of the Philadelphia County Court of Common Pleas that permits use of such standards to disprove causation.[6]

¶ 27 Appellee counters that in strict products liability actions "evidence of compliance with government regulations or industry standards is inadmissible because compliance with such standards has been held to interject into the case concepts of negligence law." Appellee's Brief, at 32. Appellee cites to the cases of *Lewis v. Coffing Hoist Division, Duff–Norton Co., Inc.,* 515 Pa. 334, 528 A.2d 590 (1987), *Majdic v. Cincinnati Machine Co.,* 370 Pa.Super. 611, 537 A.2d 334 (1988), *appeal denied,* 520 Pa. 594, 552 A.2d 249 (1988), and *Sheehan, supra.*

¶ 28 Initially, we note that [i]n all products liability cases, the plaintiff must prove (1) the existence of a defect in the product that was present at the time the product left the control of the manufacturer; and (2) that the defect caused the plaintiff's injuries. The threshold question of whether the product is defective may be shown in two ways: proof of a manufacturing defect or proof of a design defect. A subcategory of design defect includes inade-

quate warning, to the user or consumer, of the defect or dangerous propensity of the product. ... A product is defective due to a failure-to-warn where the product was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product.

*Donoughe v. Lincoln Elec. Co.,* 936 A.2d 52, 61–62 (Pa.Super.2007) (internal citations and quotation marks omitted), *reargument and reconsideration denied,* 2007 Pa.Super. LEXIS 6044 (Dec. 13, 2007). Moreover,

[t]he question of whether an alleged defect renders a product "unreasonably dangerous" is one of law. Accordingly, the trial judge is required, prior to submitting the case to the jury, to "decide whether, under [the] plaintiff's averments of facts, recovery would be justified." When arriving at its decision, the court acts "as both a social philosopher and a risk-utility economic analyst." A great many factors may be taken into account by the court in conducting its analysis, including,

the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design.

However, ...

---

**6.** This Order was entered by the Honorable Victor J. DiNubile, Jr. on January 7, 1997, and states:

[R]egarding the use of government regulations and standards in Phase II asbestos trials, it is hereby ORDERED that such materials may be used under the following limited circumstances:

1) Government regulations and standards may be used only to establish or disprove causation; they may not be used to establish or disprove product defect nor may

they be used to establish a "state-of-the-art" defense.

2) If used to establish or disprove causation, government regulations and standards must be relevant to plaintiff's alleged exposure; that is, a party seeking to use a regulation or standard promulgated subsequent to plaintiff's alleged exposure must show compliance or lack of compliance with such regulation or standard at the time of plaintiff's exposure.

R.R. at 1513.

[a] risk/utility analysis is not well[-]suited to an inadequate warnings case, for in a warnings case, as distinguished from a defective design case, the utility of a product will remain constant whether or not a warning is added, but the risk will not.

*Id.* at 66 (citations omitted).

¶ 29 We begin our analysis with a review of our Supreme Court's decision in *Lewis.* The question for decision in *Lewis* was "whether the trial court properly excluded the [manufacturers'] evidence of industry standards and practices[, sometimes also referred to as custom,] relating to the design of control boxes for electric hoists." *Lewis,* 515 Pa. at 339, 528 A.2d at 592. In that case, Mr. Lewis was seriously injured while operating an overhead electric chain-hoist to lift into position a large metal carriage assembly. The overhead electric hoist was such that it could be started and stopped, and its load maneuvered into various positions, by means of a "control pendant," which was comprised of a control box attached to a cable leading to the hoist motor overhead. Protruding from the surface of the box were push-type buttons by which the hoist was operated. The injury to Lewis occurred when a carriage assembly became jammed on one of the hoists because of a stuck chain. In an effort to correct the situation, he moved the control pendant to a certain position relative to the suspended load. In the course of doing that he stumbled and fell, causing his thumb to strike the down button on the control box. As a result, the front end of the carriage assembly swung forward and hit Lewis in both legs resulting in contusions, lacerations and fractures of the fibula and tibia of his right leg.

¶ 30 Plaintiff asserted that the control box for the hoist was defectively designed because there was no guard or other protective feature over the buttons on the box

to prevent accidental activation of the hoist. Prior to the start of trial, the court barred the defendant from putting into evidence a publication of the American Society of Mechanical Engineers (ASME) setting forth standards respecting the manufacture of electric hoists and other industrial lifting equipment. The trial court excluded this evidence on the ground that the ASME publication was totally silent on the subject of the design and guarding of buttons on the control pendants of electric hoists. The trial court also ruled that the defendant could not present testimony, through its expert witness, that "at least ninety percent" of the electric hoists made in this country had control boxes devoid of any type of guard around the activating buttons. In excluding evidence on this point, the trial court concluded that proof of the defendant's compliance with industry-wide standards, practices and customs would inject into the case concepts of negligence law, and that under the decision in *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020 (1978), negligence concepts have no role in a case based entirely on strict liability under Section 402A of the Restatement (Second) of Torts. Following affirmance by this Court, our Supreme Court granted allowance of appeal to the manufacturer.

¶ 31 Our Supreme Court agreed, concluding that "the question of whether or not the defendant has complied with industry standards improperly focuses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself." *Id.* at 342, 528 A.2d at 594 (citing *Lenhardt v. Ford Motor Co.,* 102 Wash.2d 208, 683 P.2d 1097 (1984)). Accordingly, the Supreme Court held that "such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry," namely "the quality or design of the prod-

uct in question." *Id.; see also Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 292, 696 A.2d 1169, 1172 (noting that "[e]vidence of due care by a defendant is both irrelevant and inadmissible in a products liability case since a manufacturer may be strictly liable even if it used the utmost care," and citing *Lewis* for the proposition that industry standards and practices are inadmissible in strict liability actions because they improperly inject negligence principles). The Supreme Court also indicated that "there is no relevance in the fact that such a design is widespread in the industry." *Lewis,* at 342–343, 528 A.2d at 594.

¶ 32 Subsequently, this Court in *Majdic, supra,* found that the trial court committed reversible error by permitting, over objection, the defendant's witness to testify that it was customary practice at that time for an employer or another party implementing the press brake into a metal forming system to provide the necessary safety devices and further permitting introduction of the 1973 American National Standards Institute (ANSI) safety standards for power presses to demonstrate that the standard in 1973 was the same as the trade custom prevalent in 1949 when the press was sold to the employer. Relying on our Supreme Court's decision in *Lewis,* this Court found that the trial court erred in permitting introduction of this evidence in a strict liability case since it related to the reasonableness of a manufacturer's conduct.

¶ 33 Similarly, in *Sheehan, supra,* we followed *Majdic* and *Lewis,* in determining that the trial court did not err in refusing to admit OSHA regulations where the reasonableness of defendant's failure to provide a safety device was irrelevant in strict liability action. John Sheehan was working as a machine operator for Pittsburgh Bridge and Iron Works (PBI) when he was injured. At that time, he was using a shear designed, manufactured, and sold by the Cincinnati Shaper Company (Shaper). Sheehan and his wife brought a strict liability action against Shaper, alleging, *inter alia,* that the shear was defective. During the course of the trial, Shaper attempted to admit into evidence OSHA standards. The trial court precluded this evidence. In the end, the jury awarded the Sheehans $150,000.

¶ 34 On appeal to this Court, Shaper challenged the propriety of the trial court's ruling concerning the inadmissibility of the OSHA standards. We characterized Shaper's argument as follows:

> Principally, Shaper alleges that the trial court erred by refusing to permit Shaper to admit OSHA standards into evidence. The OSHA standards proffered allegedly would show that the buyer of the equipment, PBI, has a duty to provide safety mechanisms for the shear that injured Sheehan. Shaper contends that because providing a safety guard was PBI's responsibility, PBI's failure to buy the improved guard offered to them is relevant to the issue of causation and therefore should have been admitted. Although Shaper attempts to couch its argument in terms of causation, it fails to explain how OSHA standards are relevant to that issue. The essence of Shaper's argument is that Shaper acted reasonably by designing the shear without a safety guard since OSHA standards place the responsibility of providing a safety guard on the buyer/employer.

*Sheehan,* 555 A.2d at 1354.

¶ 35 In rejecting Shaper's argument we noted:

> Liability in a strict liability action will attach where the manufacturer distributes a defective product and the existing defect is a substantial factor in causing injury to another. The reasonableness

of the manufacturer's conduct in choosing a particular design is not an issue. We conclude that the OSHA regulations proffered would introduce into a strict liability action the reasonableness of Shaper's failure to provide the new safety device for this machine, an issue irrelevant to whether liability attaches. Accordingly, the trial court did not err by sustaining Sheehan's objections to the introduction of this evidence.

This [C]ourt addressed the question of whether industry customs and standards may be introduced to show that an employer, rather than the manufacturer, had the responsibility to provide necessary safety equipment in *Majdic, supra.* In that strict liability action, the plaintiff's hands were seriously injured when they came into contact with the point of operation of a power press machine. At trial, the court permitted the defendant to introduce evidence of industry standards and customs which directed the burden of supplying protective equipment for the machine upon the employer. Specifically, the proffered industry standards were federal safety standards which had been published by American National Standards Institute (ANSI).

Relying on our supreme court's decision in *Lewis* [ ], we held that the introduction of industry standards in a strict products liability case was impermissible because such evidence had the effect of introducing the reasonableness of the manufacturer's conduct into an action which focuses, for public policy reasons, upon the existence of a defect. We find the case before us is indistinguishable from *Majdic.* Shaper also sought to introduce government regulations which would have had the effect of shifting the jury's attention from the existence of a defect to the reasonableness of the manufacturer's [Shaper's] conduct. Accord-

ingly, the trial court did not err in precluding the introduction of this evidence. *Sheehan,* 555 A.2d at 1354–1355 (citations omitted).

¶ 36 Crane argues that this Court's panel decision in *Jackson, supra,* is directly on point and has not been overruled. Therefore, Crane urges this *en banc* panel to apply *Jackson* and overrule the contrary holding of *Sheehan.* We find that *Jackson* has been implicitly, if not directly, overruled by our Supreme Court's subsequent decision in *Lewis,* and *Sheehan* properly applied *Lewis* in precluding the use of government standards. As in *Lewis* and *Majdic,* this Court's determination that governmental regulations are inadmissible in strict liability cases was based upon the general premise that the introduction of such evidence has the effect of shifting the jury's attention from the existence of a defect to the reasonableness of the manufacturer's conduct, which is irrelevant in strict liability actions. Such a premise holds true regardless of the proffered reason for introducing governmental regulations into evidence.

¶ 37 The strength of this conclusion is bolstered by examining the underlying basis for the panel's decision in *Jackson.* In *Jackson,* the panel concluded that "[w]hile compliance with [Federal Motor Vehicle Safety Standards] is not conclusive as to the absence of liability under a theory of strict liability, compliance is of probative value in determining whether there was a defect." *Id.,* 503 A.2d at 948. In reaching this decision the *Jackson* panel believed the issue was controlled by our decision in *Brogley v. Chambersburg Engineering Co.,* 306 Pa.Super. 316, 452 A.2d 743 (1982), which was a **negligent** design case wherein we held that evidence of OSHA regulations is admissible as a standard of care, the violation of which is evidence of **negligence.** In *Brogley,* we noted that "[a]ll-

though the courts of this state have not had occasion to rule on the admissibility of OSHA regulations **as evidence of negligence,** they have uniformly held admissible other safety codes and regulations intended to enhance safety." *Id.* at 745 (emphasis added). Thus, *Brogley* was merely applying the well-settled principle that proof of a violation of a statute can be used as evidence of negligence to the use of OSHA regulations as supplying the standard of care. *See* Restatement (Second) of Torts § 286; and, 27 P.L.E. § 175, Violation of Statute or Ordinance: "Proof of the violation of a statute or ordinance is permissible, not as conclusive proof of **negligence,** but as evidence to be considered with all other evidence in the case." (emphasis added). Clearly, *Jackson* was premised upon negligence principles that were definitively precluded from being interjected into a strict liability case by *Lewis. See also Harsh v. Petroll,* 840 A.2d 404, 425 (Pa.Commw.2003) (refusing to follow *Jackson* based upon *Lewis), appeal denied,* 581 Pa. 693, 864 A.2d 531 (2004), and *Gaudio v. Ford Motor Co.,* 976 A.2d 524, 547 (Pa.Super.2009) (applying the rule in *Lewis* and finding error in the admission of evidence comparing the safety ratings from the National Highway Traffic Safety Administration for the Ford F–150 and those of other vehicles in a strict liability design defect case, because manufacturers may not attempt to prove the quality or design of their product by showing that it comports with industry or government standards or is in widespread industry use).

¶ 38 Moreover, we note that Appellants' citations to secondary sources for their contentions that most courts allow governmental regulations to be admitted in strict liability cases are misleading. Appellants fail to provide any instructive discussion of the cases they rely upon as to why those courts chose to allow such evidence to be admitted. Our review of the cited authority reveals that the cases relied upon by Appellants either involved claims by plaintiffs sounding in both negligence and strict liability [7] or were predicated upon the definition of defect articulated by those jurisdictions, which differs from the one articulated by our Supreme Court in *Azzarello, supra.* Typically, the jurisdictions allowing admission of safety standards have derived their definition of "unreasonably dangerous" from comment (i) to Restatement (Second), Torts, § 402A, which provides that "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second), *supra,* § 402A, comment (i). This is sometimes referred to as the "consumer expectations" test. Under this definition, the evidence of wide use in an industry may be relevant to prove a defect because the evidence is probative, while not conclusive, on the issue of what the consumer can reasonably expect.

¶ 39 In *Lewis,* our Supreme Court acknowledged various approaches to defining product defect in a design case. The court noted that under a "consumer expectations" approach, adopted by the California Supreme Court in *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), a product is deemed defective in design "if it failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Lewis,*

---

7. *See, e.g., Arnoldy v. Forklift, L.P.,* 927 A.2d 257 (Pa.Super.2007) (finding no error in admitting OSHA regulations in strict liability case involving forklift where negligence was also alleged).

at 340, 528 A.2d at 593. The *Lewis* court took cognizance of the risk-utility approach, under which a product design is defective where "on balance, the benefits of the challenged feature outweigh the risk of danger inherent in such design," *id.,* but went on to state that the *Azzarello* Court "sets forth yet another approach" to determining design defects—the intended use approach. *Id.* Thus, in Pennsylvania "defect" is defined in terms of safety for intended use; "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello,* 480 Pa. at 559, 391 A.2d at 1027. Accordingly, the prevailing test for defective design in Pennsylvania rendered evidence of industry standards irrelevant to the existence of a defect.[8]

¶ 40 Moreover, we are not persuaded by Appellants' attempt to distinguish industry standards from government standards or regulations. Industry standards outline the practices common to a given industry. They are often set forth in some type of code, such as a building code or electrical code, or they may be adopted by the trade organization of a given industry. The safety requirements found in the OSHA regulations seem more analogous to building codes and other industry-specific safety guidelines than to scientific or medical developments representing the cutting edge of asbestos-related disease causation. Here, the OSHA standards direct employers, and not manufacturers, whose business makes use of asbestos in some manner to satisfy certain conditions for their workers' safety. In this regard, the OSHA standard at issue provides nothing more than a code of conduct for employers much like building or electrical codes are codes of conduct applicable to those trades. Moreover, this OSHA standard does not even direct manufacturers of asbestos-containing products to design their products to meet the established permissible emission level (PEL). The fact that the quality or design of the product in question comports with industry standards or customs or is in widespread industry use as in *Lewis,* or comports with government standards as in *Majdic* and *Sheehan,* is no different than the fact that the quality or design of the product in question comports with standards established by government agencies that bear upon workplace safety or environmental concerns.[9] In either situation the use of

8. We further note that our Supreme Court in reaching its decision in *Lewis* acknowledged that there existed a split of authority among the courts of other jurisdictions "when it comes to the relevance, and hence admissibility, of evidence showing industry standards, customs and practices concerning the design of products." *Id.* at 342, 528 A.2d at 593. In choosing to align with those jurisdictions that hold such evidence is inadmissible, the Supreme Court rejected the reasoning of the same line of cases from other jurisdictions, which Appellants now advocate as the majority view allowing evidence of industry standards. In so holding the *Lewis* Court implicitly recognized the uniqueness of the Pennsylvania test as justification for its divergence from the view shared by the so-called majority jurisdictions that have addressed the issue and have allowed evidence of industry standards to be admitted.

9. The U.S. Department of Labor utilizes OSHA to protect against many health concerns, including asbestos. *See* 29 C.F.R § 1910.1001(a)(1). "Under the Occupational Safety and Health Act of 1970, OSHA's role is to assure safe and healthful working conditions for working men and women; by authorizing enforcement of the standards developed under the Act; by assisting and encouraging the States in their efforts to assure safe and healthful working conditions; by providing for research, information, education, and training in the field of occupational safety and health." U.S. Department

such evidence interjects negligence concepts and tends to divert the jury from their proper focus, which must remain upon whether or not the product, when it left the control of the manufacturer, was "lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello*, at 559, 391 A.2d at 1027. In the context of asbestos-related injuries, the feature that renders the product unsafe for its intended use is the presence of asbestos in the product or more accurately the dangers from inhalation of asbestos fibers that can be emitted from the product. In *Lewis*, it was the reasonableness in choosing a design without recessed buttons as opposed to with recessed buttons or shielded buttons, and here it would tend to draw the jury's attention to the reasonableness of Appellants' choice to design their products to encapsulate the asbestos as opposed to designing their products without the inclusion of any asbestos in the products. One who asserts that their product is not defective because it is in compliance with either industry or governmental standards necessarily implicates their behavior in seeing to it that their product so complies.[10] Consequently, we read *Lewis* and its progeny as precluding the introduction of OSHA standards for the purpose of establishing the existence or absence of a product defect. Where the Supreme Court has spoken on a particular subject, it is our obligation as an intermediate appellate court to follow the dictates of our Supreme Court, absent a legally relevant distinction. *Malinder v. Jenkins Elevator & Machine Co.*, 371 Pa.Super. 414, 538 A.2d 509, 513 (1988) (*en banc*). No such distinction exists here. Accordingly, we are bound to apply *Lewis* until our Supreme Court chooses to re-examine the matter.[11]

of Labor, Occupational Safety and Health Administration, OSHA's Role, http://www.osha.gov/oshinfo/mission.html (last visited August 18, 2009). The EPA helps to minimize the harms produced by asbestos through utilizing two environmental laws: school environments are protected through the Asbestos Hazard Emergency Response Act (AHERA) and, pursuant to the Clean Air Act, the National Emission Standards for Hazardous Air Pollutants (NESHAP) addresses general toxic emissions. U.S. Environmental Protection Agency, Region 4: Asbestos, Asbestos Information, http://www.epa.gov/region4/air/asbestos (last visited August 18, 2009).

10. Additionally, Dana cites to *Blacker v. Oldsmobile Div., GM Corp.*, 869 F.Supp. 313 (D.Pa.1994), and *Christner v. E.W. Bliss Co.*, 524 F.Supp. 1122 (D.Pa.1981), in support of its argument that there is a difference between industry and governmental standards. However, both cases fail to provide any support as *Blacker* relied upon *Jackson*, which, as we previously discussed, was inappropriately premised upon negligence principles, and *Christner* was decided before *Lewis*.

11. We recognize that in *Cave v. Wampler Foods, Inc.*, 961 A.2d 864, 869 (Pa.Super.2008), a panel decision filed two months after we granted *en banc* review in this matter, Appellants sought to introduce evidence that the Code of Federal Regulations sets forth a tolerance for a small amount of bone material in processed meat. The panel held that the proffered evidence was admissible "under the unique facts of this food products claim" and found the case distinguishable from the usual bar on government standards in strict liability cases where the standards are impermissibly used to introduce an inference of reasonableness into the manufacturing process. While the *Cave* opinion does not disclose whether the suit proceeded solely on a claim of manufacturing defect or also included a failure to adequately warn claim, to the extent that this language suggests that evidence of this kind is relevant, though not conclusive, of whether a manufacturing or design defect exists, we disapprove of that language.

We find that the holding in *Cave* cannot be expanded beyond the scope of the facts before that Court, especially when to do so would represent an enormous re-working of the fun-

¶ 41 Appellants also submit that even if OSHA standards are inadmissible to prove a lack of defect they should be admissible to disprove causation. We can discern no difference and, therefore, disagree. We view this argument as a backdoor attempt to have the OSHA standards admitted to disprove defect. Crane's original argument as to admissibility makes clear that it was its intended purpose to use the OSHA regulations to prove its product was not defective. *See* Crane's Brief, at 14 (stating "[Appellants] would have been permitted to argue that their products release asbestos fibers in amounts below the OSHA permissible exposure level, and are therefore not defective."). In any event, causation in asbestos related disease cases is essentially a medical question, that is, can the plaintiff's asserted level of exposure to the defendant's product, provided the plaintiff has already satisfied the dictates of *Gregg*, have caused his illness. Resolution of this cause-in-fact question is not furthered by reference to OSHA's PEL. The only matter demonstrated by this standard is that the government has

deemed it unnecessary for an employer to take any measures to protect its workers from a certain level of exposure to asbestos. The PEL has no relevance to determining whether or not the levels Mr. Hicks was exposed to can cause mesothelioma. What Appellants' arguments in this regard fail to recognize or acknowledge is that the basis for OSHA's establishment of a PEL was OSHA's policy for carcinogens that assumed that no safe threshold level was demonstrable and, therefore, that the Act required the Agency to set the PEL at a level as low as technologically and economically feasible. *See* 59 Fed. Reg. 40964–01, 40967 (Aug. 10, 1994) (stating OSHA believes that the regulatory limit of .1 fiber per cubic centimeter of air as an eight-hour time-weighted average is "the practical lower limit of feasibility for measuring asbestos levels reliably.").[12] Consequently, apprising the jury that Appellants' theory of lack of causation is premised upon a regulation promulgated by OSHA does nothing to add to the jury's understanding in resolving the causation

---

damental law at issue as expressed in *Lewis*. Rather, we read *Cave* as permitting limited introduction of government standards in food product warning defect cases only where the standard is specifically incorporated into the warning. For example, with respect to *Cave*, if the product was labeled with a warning defining "boneless" to include meat products having up to 1% bone by weight as per the federal regulation, then that regulation would be relevant and admissible as bearing upon the question of whether or not the warning was adequate to inform the consumer of the risks of ingesting bone fragments in a product marketed as "boneless." In other words the jury would be charged to consider whether the product was safe in light of the warning that was given. If, however, the warning did not include such a definition, then introduction of this evidence impermissibly calls into question the reasonableness of the manufacturer's conduct in manufacturing the product. That is, the manufacturer's contention would be that there was no mishap during the man-

ufacturing process and they marketed their product in a safe condition because it complied with the regulation. Such use violates the well-settled principle first expressed in *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975), and consistently applied in *Azzarello, Lewis* and it progeny, that holds negligence concepts have no place in a case based on strict liability.

12. Almost immediately after its creation, OSHA promulgated an initial regulation imposing a time-weighted average (TLV) of twelve fibers per cubic centimeter. *See* 36 Fed. Reg. 10466, 10506 (table G–3) (May 29, 1971). A year later, it reduced the TLV to five fibers per cubic centimeters. In 1976, OSHA further reduced the TLV to two fibers per cubic centimeter. Ten years later, OSHA reduced the overall TLV to 0.2 fibers per cubic centimeter, and then to the current 0.1 fibers per cubic centimeter in 1994. 29 C.F.R. § 1926.1101.

question. The jury was fully apprised of the competing causation theories and chose to accept Appellee's expert's testimony.

¶ 42 To the extent that Appellants are arguing that preclusion of this evidence violated the standing order entered by Judge DiNubile, Appellants fail to cite to the place in the record where they objected to the trial court's preclusion of this evidence on that basis. Accordingly, we find any argument concerning the applicability of that order waived.

¶ 43 Crane next argues that the trial court erred in excluding what it describes as "exculpatory testimony of [Appellee's] own expert witness." Crane's Brief, at 27. By way of background, during his deposition, Appellee's expert, Dr. James Giudice, was asked if he was familiar with any epidemiologic articles which relate a specific fiber concentration to the development of mesothelioma. Dr. Giudice responded as follows:

I can only answer this indirectly. I don't know of anybody that looked specifically at the fibers per cc and equate [sic] it to mesothelioma because it's impossible to have that kind of controlled study. You can't do that. You can't have that kind of second-to-second analysis of exposure to asbestos in the workplace over so many years and then relate that to mesothelioma. It can only be obtained indirectly as it has been, and it deals with the dose response relationship which is well established with mesothelioma and asbestos.

So, in answer to your question, again, the lower limit is not defined above which we do know mesothelioma develops, **and it does develops [sic] with concentrations above the present accepted—and at the present accepted level in the workplace which is .1 fiber per cc of air in the workplace. That is the present standard.**

Videotaped Deposition of Dr. James Giudice, 6/8/04, at 243–244 (emphasis added); C.R. at Exhibit P–6.

¶ 44 Before trial began, Appellee contended that the portion of Dr. Giudice's testimony that we have highlighted improperly referenced governmental standards, which the trial court had already ruled were inadmissible. Based upon this contention, Appellee requested that this portion of Dr. Giudice's testimony be stricken, and the court granted the request.

¶ 45 Crane maintains that Dr. Giudice's testimony did not include any mention of governmental standards; therefore, even if governmental standards were properly excluded by the trial court said exclusion did not apply to Dr. Giudice's generic and relevant answer.[13]

¶ 46 Crane fails to present a convincing argument that Dr. Giudice's statement as to the "present standard" was not in reference to governmental standards. In fact, Crane's argument in its brief makes clear that it did not want Dr. Giudice's "workplace standard" testimony to be stricken so that Crane could then cross-examine Dr. Giudice as to the governmental standards. See Crane's Brief at 28 (citing a federal district court opinion for the proposition that a defendant is allowed to cross-examine a plaintiff's expert regarding

13. Dana included a similar issue in the Argument portion of its brief. Dana's Brief at 36–37. Dana, however, failed to include such an issue in its "Statement of Questions Involved." See Pa.R.A.P. 2116(a) (stating "This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.").

OSHA standards when the expert referred to the standards in his or her testimony).

¶ 47 A fair reading of Dr. Giudice's testimony leaves little doubt that the standard to which he referred was a governmental standard. Had the trial court denied Appellee's request to strike Dr. Giudice's testimony regarding this standard, such a decision would not have been in accord with the court's previous ruling to exclude such evidence. Given that we already have determined that Appellants have failed to present a meritorious claim that the trial court erred by excluding evidence of governmental standards and regulations, we further conclude that the trial court did not abuse its discretion by striking the portion of Dr. Giudice's testimony in question. We further note that Crane mischaracterizes Dr. Giudice's response as being "exculpatory" or "corroborative" of Crane's defense theory. When the quoted passage is read in context with the preceding response, it is clear that before he acknowledges that mesothelioma does develop with concentrations above the level of .1 f/cc, he reiterated his opinion that there is no known threshold level below which mesothelioma will not develop. Therefore, this testimony was not "exculpatory" or "corroborative" of Crane's defense theory but merely cumulative of evidence already before the jury.

¶ 48 In its final claim under its second issue, Crane maintains that the trial court erred by allowing Appellee to cross-examine Crane's expert witness about warning labels on Crane products and by then disallowing Crane from questioning the same witness regarding the governmental standards underlying the warning labels.

¶ 49 Initially, we note that the scope and limits of cross-examination are within the trial court's broad discretion and its ruling thereon will not be reversed "absent a clear abuse of discretion or an error of law." *In re S.B.,* 208 Pa.Super. 21, 943 A.2d 973, 981 (2008) (citation omitted), *appeal denied,* 598 Pa. 782, 959 A.2d 320 (2008). Crane argues that because the language on the label was taken directly from a regulation promulgated by OSHA Appellee's counsel opened the door to allowing testimony regarding government standards by cross-examining Mr. Buccigross on the contents of the warning label placed on Crane's products.

¶ 50 In rejecting the instant claim the trial court opined as follows:

During cross-examination, Mr. Buccigross testified that John Crane asbestos-containing products did not create dust, nor did it release respirable fibers, but if they did, the amount was insignificant. In response, [Appellee's] counsel asked Mr. Buccigross if he was aware of the warning labels that John Crane placed on its asbestos-containing products. (N.T. 6/18/04, pp. 61–65). Pursuant to *Smalls v. Pittsburgh–Corning, Corp., et al,* 843 A.2d 410 (Pa.Super.2004), [Appellee's] counsel was permitted to cross-examine Mr. Buccigross regarding the warning labels placed on John Crane's asbestos-containing products. In *Smalls,* the Superior Court determined that where the [defendant] presented evidence that it's [sic] asbestos[-]containing products did not release significant amounts of asbestos dust, and therefore, could not have been a substantial factor in causing [plaintiff's] asbestos[-]related disease, the trial court properly allowed evidence of the warning to impeach and rebut the witness's claim that the product was not prone to create dust. *Id.*

In the instant case, [Appellee's] counsel did not question Mr. Buccigross about the warning label placed on the asbestos-containing product to prove

that [Crane] put warning labels on its product pursuant to government mandates. In fact, [Crane] voluntarily placed those labels on its products. The questioning and subsequent answer was used to impeach Mr. Buccigross' testimony that John Crane's asbestos-containing products did not create dust. The author of the language on the label was irrelevant. [Crane] was permitted to question Mr. Buccigross on redirect examination regarding the issue of warnings, and therefore, [Crane] was not prejudiced by the [c]ourt's ruling that Mr. Buccigross could be asked about the warning label. The questioning did not "open the door" to the introduction of OSHA regulations as argued by [Crane].

Trial Court Opinion, 10/24/07, at 13–14. We agree with the trial court's analysis and find no abuse of the trial court's discretion in limiting Crane's re-direct examination on this matter.

¶ 51 Under its third and final issue, Crane raises a number of complaints concerning the trial court's instructions to the jury.

Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case.

Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue.

Gorman v. Costello, 929 A.2d 1208, 1211–1212 (Pa.Super.2007) (citation omitted).

We will grant a new trial based on error in the court's charge if, upon considering all the evidence of record we determine that the jury was "probably misled" by the court's instructions or that an omission from the charge amounted to "fundamental error." Price v. Guy, 558 Pa. 42, [46,] 735 A.2d 668, 671 (1999); see also Carpinet v. Mitchell, 2004 PA Super 197, 853 A.2d 366, 371 (Pa.Super.2004)[, appeal denied, 586 Pa. 706, 889 A.2d 1212 (2005)]. Conversely, "[a] jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations." Cruz v. Northeastern Hosp., 2002 PA Super 185, 801 A.2d 602, 611 (Pa.Super.2002).

Betz, supra, 957 A.2d at 1260–1261 (quoting Angelo v. Diamontoni, 871 A.2d 1276, 1279 (Pa.Super.2005), appeal denied, 585 Pa. 694, 889 A.2d 87 (2005)). Furthermore,

[i]n reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

Schmidt v. Boardman Co., 958 A.2d 498, 515 (Pa.Super.2008), appeal granted, 601 Pa. 381, 973 A.2d 411 (2009) (quoting Reilly v. SEPTA, 507 Pa. 204, 231, 489 A.2d 1291, 1305 (1985)).

¶ 52 Crane contends that the trial court erred in its instructions regarding causation. Crane first asserts that it proposed the court read the Pennsylvania Suggested Standard Civil Jury Instruction (PSSCJI) concerning causation.[14] According-

14. The instruction which Crane proposed stated:

FACTUAL CAUSE

The plaintiff must prove to you that asbestos caused the plaintiff's injury. This is referred to as "factual cause." The ques-

ing to Crane, the trial court erroneously supplemented this proposed instruction with language from this Court's decision in *Andaloro, supra.* Crane maintains the trial court indicated to the parties before closing arguments that it would not give the *Andaloro* charge as written by Appellee; however, the court acted contrary to that indication. Crane contends that the *Andaloro* charge given by the trial court incorrectly stated that proof of nothing more than mere exposure to asbestos is sufficient to prove causation. In other words, the *Andaloro* charge failed to state that, in order to prove causation, Appellee was "required to prove both that the decedent inhaled asbestos fibers from the defendant's product and that the inhalation was the factual cause of the decedent's asbestos-related injury." Crane's Brief at 34. Additionally, Crane claims that it was prejudiced by the trial court's decision to read the *Andaloro* charge to the jury because, had it known that the court was going to give this charge, it would have tailored its closing argument accordingly.[15]

¶ 53 As to factual causation, the trial court initially instructed the jury as follows:

> Factual cause. If you find that the product was defective, the defendant is liable for all harm caused by such defective condition. A defective condition is the factual cause of harm if the harm would not have occurred absent the defect. In order for the plaintiff to recover in this case, the defendant's conduct

must have been a factual cause of his mesothelioma.

> The seller of a product is liable for all harm from which his or her defective product is the factual cause, whether such harm be to a user, a consumer, or a bystander. The seller or defendant manufacturer by placing their product into the stream of commerce is responsible to all who come within the boundaries of its use.

> **Pennsylvania law provides that causation of asbestos-related injuries is shown upon proof that plaintiff inhaled some fibers from the products of the defendant manufacturers. There is no requirement that a plaintiff in an asbestos case provide how many asbestos fibers are contained in the dust emissions from a particular asbestos-containing product.**

> **Similarly, the plaintiff need not demonstrate the specific lengths of fibers contained in the manufacturer's product, the length of fibers he inhaled, or the overall concentration of fibers in the air.**

N.T. Volume 9, 6/24/04, at 28–30 (emphasis added).[16]

¶ 54 After the court completed its instructions to the jury, the parties lodged their objections thereto. Appellants had several complaints as to the court's factual causation instruction. Appellants claimed that the court acted contrary to its previ-

---

tion is: "Was asbestos a factual cause in bringing about the plaintiff's damages?"
Asbestos is a factual cause of harm when the harm would not have occurred absent the asbestos exposure. The asbestos exposure is a factual cause of an outcome if, in the absence of the exposure, the outcome would not have occurred.
Proposed Points of Charge on Behalf of [Crane], 6/10/04, at 3 (citing PSSCJI, § 3.25 (2003)).

**15.** Dana presents substantially similar arguments under its first and second issues quoted above.

**16.** The portion of the instruction which we have emphasized is the so-called *Andaloro* charge. *See Andaloro,* 799 A.2d at 86.

ous ruling that it would not read to the jury Appellee's *Andaloro* charge. Dana's counsel argued that this charge misrepresented what constitutes proof of causation, so much so that a mistrial was warranted. The court denied the motion for a mistrial. Counsel for Dana subsequently requested that the court instruct the jury to disregard the *Andaloro* language in the factual cause instruction. The court denied that request but eventually informed the jury that it misspoke in part.

¶ 55 After making this statement, the court provided the following instruction to the jury:

> In this case the plaintiff has the burden of proving the following propositions: That the plaintiff inhaled asbestos fibers, that the defendants manufactured the defective product, that the defective product was the factual cause of the plaintiff's mesothelioma.

N.T. Volume 9, 6/24/04, at 50. Following this restatement of the burden of proof the court inquired if there were any additions or corrections, and all parties replied in the negative. *Id.* at 50–51. The court then explained factual cause as follows:

> Now one other thing, factual cause. I am going to read that again to you. The parties have asked me to do that.
>
> If you find that the product was defective, the defendant is liable for all harm caused by such defective condition. A defective condition is the factual cause of harm if the harm would not have occurred absent the defect. In order for the plaintiff to recover in this case, the defendant's defect must have been a factual cause of his mesothelioma.

*Id.* at 51. After the court read this instruction, it asked counsel if any additions or corrections to the instruction were needed. All counsel responded in the negative. The court then sent the jury to deliberate.

¶ 56 After deliberating for over two-and-a-half hours, the jury returned with the following question: "Judge Lynn, can we please have verification as to what a 'factual cause' is? To determine such, do we consider each company's product individually or all collectively?" *Id.* at 52. The court informed the parties' counsel that it intended to address these questions by restating to the jury the instructions regarding burden of proof and factual cause. Counsel for Dana objected to the court reading the burden of proof instruction again, and the court overruled the objection.[17]

¶ 57 The court called the jury back into the courtroom. As to the factual cause portion of the jury's question, the court read the following instruction:

> If you find that a defendant's asbestos-containing product was defective, the defendant is liable for all harm to the plaintiff caused by such defective condition. A defective condition is [sic] the defendant's asbestos-containing product is the factual cause of the mesothelioma suffered by the plaintiff if the mesothelioma would not have occurred without exposure to the defendant's defective product. That's factual cause.

*Id.* at 62. The court followed up by giving the instruction regarding the burden of proof to answer the second part of the question on whether to consider each defendant's product individually. Counsel

---

**17.** During this discussion, counsel for Dana moved for a mistrial based upon "cumulative errors" and the court's prior decision to read the *Andaloro* instruction to the jury. Counsel, in part, premised this motion on counsel's contention that the court had previously ruled that it would not give the instruction as written but then nonetheless gave the instruction as Appellee proposed it. The court denied the motion.

for Dana asked the court to clarify that instruction for the jury, and the court did so. The court then asked if any corrections or additions were necessary, and all counsel responded in the negative. The jury returned to deliberate.

¶ 58 Upon our careful review of the above-summarized exchange and the charge as a whole, we find that the court did not err in the manner in which it instructed the jury regarding causation. Admittedly, prior to giving the jury its instructions, the trial court did not explicitly state how it would incorporate Appellee's *Andaloro* charge into its "factual cause" instruction. However, the court only read the *Andaloro* language once to the jury in its original factual causation instruction, and Appellants' objection [18] to the language was addressed and any confusion the jury might have had regarding the court's original instructions was eliminated when the court restated its instructions as to the burden of proof and causation. Most importantly, the court's causation instructions to the jury clearly and adequately expressed that, in order to meet her burden of proof, Appellee was required to demonstrate that Mr. Hicks' asbestos-related injuries were, in fact, caused by each of the Appellants' defective products. In fact, the trial court's subsequent instructions utilized the specific language proposed by counsel

for Dana as being satisfactory. *See* N.T. Trial Volume 9, 6/24/04, at 42. Moreover, contrary to Appellants' assertion, the trial court did not give conflicting factual causation instructions. Rather, the trial court merely gave an initially incomplete instruction which it later completed following counsels' objections. Therefore, the trial court did not err in refusing to grant a new trial on this basis.[19]

¶ 59 We now turn our attention to the remaining issues presented by Dana (issues 3, 4, and 6) that we have not already addressed in our discussion of Crane's issues. Under its third issue, Dana "maintains that § 2 [of the Restatement (Third) of Torts, *Products Liability*, (1997),] rather than § 402A [of the Restatement (Second) of Torts (§ 402A) ] should govern this action, for the reasons stated in Justice Saylor's ... concurring opinion in *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000 (2003)." Dana's Brief at 23. Initially, we note that our Supreme Court in *Phillips* was divided. The late Chief Justice Cappy authored the lead opinion, reiterating the firm distinction in Pennsylvania law between strict liability and negligence theories as they apply to product liability cases. Justice Saylor wrote a concurring opinion, joined by Justices Castille and Eakin, taking issue with aspects of the lead opinion's statement that "negligence concepts have no place in

---

18. We note that Appellants' objection to the *Andaloro* language was that it only addressed one of the two requisite elements, namely, the requirement that plaintiff adduce evidence of inhalation of fibers from the defendants' products pursuant to the *Eckenrod/Gregg* test and not the proximate causation element.

19. Given our conclusion that the trial court adequately instructed the jury on causation, we can discern no prejudice suffered by Appellants (as to how they prepared their closing arguments) due to the manner in which the trial court communicated its intentions regarding Appellee's proposed *Andaloro*

charge. Further supporting this determination is the fact that, on three occasions, the trial court charged the jury on factual causation in a manner consistent with Crane's proposed charge on the issue.

Moreover, our conclusion that the trial court adequately instructed the jury on causation necessarily defeats Dana's first issue wherein Dana claims that it is entitled to JNOV because, had the jury been properly instructed regarding causation, the jury could not have found Dana liable in this case. *See* Dana's Brief at 11–12.

strict liability law," particularly as related to product liability claims based on a design defect. 841 A.2d at 1012, 1014–15 (Saylor, J., concurring). Justice Nigro concurred in the result. Justice Newman wrote a concurring and dissenting opinion. Former Chief Justice Zappala did not participate. Justice Saylor's concurrence advocated the adoption of the Third Restatement's risk-utility balancing approach. However, § 402A has remained the law in Pennsylvania since its adoption by our Supreme Court in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). While acknowledging that the view expressed by the concurrence in *Phillips* is dicta, Dana, nevertheless, seeks to have this Court overrule *Webb* and have § 2 of the Restatement (Third) of Torts become the law in this Commonwealth. Neither this Court nor the trial court has the authority to overrule the Supreme Court. *See Foflygen v. R. Zemel, M.D. (PC)*, 420 Pa.Super. 18, 615 A.2d 1345, 1353 (1992) (stating "As an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court."); *see also, Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 911 (Pa.Super.2007), wherein this Court rejected the same argument noting that ("[u]ntil and unless our Supreme Court alters its approach to strict liability, we will continue to adhere to established principles."), *appeal granted, Bugosh v. I.U. N. Am., Inc.*, 596 Pa. 265, 942 A.2d 897 (2008).[20] Consequently, the trial court did not err when it denied Appellant's request to have this matter proceed pursuant to the Restatement (Third) of Torts, *Products Liability*, § 2 (1997).

¶ 60 Dana next submits that, assuming the trial court properly denied its request to have this matter proceed under § 2 of the Restatement (Third) of Torts, § 402A only applies to an "intended user," not to a "bystander." Dana asserts that the record establishes that Mr. Hicks was a bystander, rather than an intended user; thus, Appellee failed to present sufficient evidence to prove that Dana is liable for Mr. Hicks' asbestos-related injuries. In its nearly thirty-seven page post-trial motion, Dana failed to specifically raise this issue.

¶ 61 In order to preserve issues for appellate review "a party must file post-trial motions from a trial court's decision and order following the conclusion of a trial." *Warfield v. Shermer*, 910 A.2d 734, 737 (Pa.Super.2006) (quoting *Chalkey v. Roush*, 569 Pa. 462, 468, 805 A.2d 491, 495 (2002)), *appeal denied*, 591 Pa. 737, 921 A.2d 497 (2007); Pa.R.C.P. 227.1(c). "Even when a litigant files post-trial motions but fails to raise a certain issue, that issue is deemed waived for purposes of appellate review." *Sovereign Bank v. Valentino*, 914 A.2d 415, 426 (Pa.Super.2006) (citation omitted); *see* Pa.R.C.P. 227.1(b)(2) (stating "[P]ost-trial relief may not be granted unless the grounds therefor … are specified in the motion. … Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds.").

¶ 62 The only reference in the record to this specific issue that we can find is in conjunction with Dana's preceding argument concerning the propriety of the trial court's denial of Dana's "Motion to Apply RESTATEMENT (3D) OF TORTS." Under that issue, Dana stated, "Moreover,

---

**20.** Additionally, Crane asserts that this issue is now before our Supreme Court in *Bugosh, supra*, and should the Supreme Court decide to adopt § 2, then we should grant a new trial in this matter. We note that this possibility is now moot in light of the Supreme Court's subsequent decision to dismiss that appeal as improvidently granted. *See Judith R. Bugosh v. I.U. N. Am.*, —— Pa. ——, 971 A.2d 1228 (2009).

*Phillips* also holds that strict liability only applies to intended users and [Mr. Hicks] was not such an intended user." Dana's Motion for Post–Trial Relief, 7/6/04, at 34, ¶ 94. We conclude that this passing statement, presented in support of Dana's position that the trial court erred by denying its "Motion to Apply RESTATEMENT (3D) OF TORTS," was insufficient to preserve the issue Dana now seeks this Court to consider.

¶ 63 Dana next avers that the trial court erred by instructing the jury that Appellants are liable for the harm caused by their defective products, "whether such harm be to a user, a consumer, or a **bystander.**" N.T. Trial Volume 9, 6/24/04 at 29 (emphasis added). Again relying on *Phillips, supra,* Dana maintains that recovery under § 402A is limited to the "intended user" of a product. Thus, the argument goes, the trial court erroneously instructed the jury that a bystander could recover in this strict liability case.

■ ¶ 64 We note that the instruction at issue was taken from PSSCJI § 8.10, which reads as follows:

> The seller is liable for all harm for which his defective product is the substantial cause, whether such harm be to a user, consumer, or bystander. The seller, by placing his product into the stream of

commerce, is responsible to all who come within the boundaries of its use.

*Id.* The trial court read this instruction almost verbatim with the exception that he changed "substantial" cause to "factual" cause and included "defendant manufacturer" in addition to a seller of the product. N.T. Trial Volume 9, 6/24/004, at 29. Following the giving of this charge Dana's counsel did not lodge an objection on this basis. Furthermore, during the charge conference, counsel for Dana stated his belief that *Phillips, supra,* requires **warnings** to be given to intended users and not to "others in the vicinity." N.T. Trial Volume 5, 6/18/04, at 120–123. Counsel requested that the court utilize the "intended user" language in its jury instruction with respect to PSSCJI § 8.03 (Duty to Warn). However, there was no objection from Dana wherein it specifically took exception to the use of the word bystander when describing who can recover when injured by a defective product under PSSCJI § 8.10. *See Cruz,* 801 A.2d at 610–611 (stating "where a party fails to specifically object to a trial court's jury instruction, the objection is waived and cannot subsequently be raised on appeal.") (*quoting Randt v. Abex Corporation,* 448 Pa.Super. 224, 671 A.2d 228, 232 (1996)). Accordingly, we find this claim is waived.[21]

---

**21.** We note that the primary premise of Dana's arguments under this issue and its previous issue overstates the scope of the holding in *Phillips.* Dana insists that, in *Phillips,* our Supreme Court "ruled that **recovery** under § 402A is limited to the 'intended users' of a product." Dana's Brief at 25 (citing *Phillips,* at 654, 841 A.2d at 1006) (emphasis added). The *Phillips* Court, however, did not rule that recovery under § 402A is limited to "intended users" of a product; rather, our Supreme Court concluded that "in a strict liability design defect claim, the plaintiff must establish that the product was unsafe for its intended user." *Phillips,* at 656–657, 841 A.2d at 1007 (plurality opinion authored by Cappy, C.J., with Castille, J., Newman, J.,

Saylor, J., and Eakin, J. concurring on this point); *accord id.* at 674–675, 841 A.2d at 1018 (Saylor, J., concurring); *id.* at 682–683, 841 A.2d at 1023 (Newman, J., concurring and dissenting). Finding that a child is not an intended user of a lighter and therefore the plaintiff failed to show that the lighter was unsafe for use by adults is not analogous to finding that a laborer, who is required as part of his job to work closely with tradesmen who handle asbestos-containing products, is not an intended user of those products. Moreover, Appellants cannot seriously contend that plumbers and pipefitters are not intended users. As such we find it hard to fathom how

¶ 65 Dana's final issue challenges the trial court's decision to conduct a reverse-bifurcated trial. We review such a decision under an abuse of discretion standard. *Donoughe*, 936 A.2d at 72. Dana's argument under this issue is two-fold. Dana first claims that the trial court "automatically" chose to conduct a reverse-bifurcated trial and that "automatic" bifurcation constitutes *per se* reversible error. However, Dana did not raise this specific claim in its post-trial motion. Accordingly, for reasons we explained above, Dana waived this claim.

¶ 66 Dana next contends that it is entitled to a new trial because the use of the reverse-bifurcation procedure in this case was highly prejudicial to Dana. "Reverse bifurcation is 'the practice for most asbestos cases' where 'issues of medical causation and damages [Phase I] are tried before issues involving theories of liability and product identification [Phase II].'" *Donoughe*, 936 A.2d at 71 (quoting *Fritz v. Wright*, 589 Pa. 219, 239 n. 10, 907 A.2d 1083, 1095 n. 10 (2006)). Dana supports this contention with two claims. First, Dana complains that the reverse-bifurcation procedure violated its right to due process as guaranteed by both the Pennsylvania and United States constitutions. In this regard, Dana argues that it was not provided a meaningful opportunity to be heard. Again, Dana failed to include this due process claim in its post-trial motion and, thus, has waived the claim.[22]

¶ 67 Secondly, Dana seemingly complains that the utilization of the reverse-bifurcation procedure in this case

prejudiced Dana because the procedure failed to promote the efficiencies that it is intended to advance, such as settlement. Dana presented this issue in its post-trial motion; however, even assuming that, in this case, reverse-bifurcation did not promote efficiency, Dana fails to offer a persuasive argument that such a failure warrants a finding of prejudice so severe that a new trial is warranted. As to Dana's claim of prejudice, much like the Appellants in *Donoughe*, Dana argues that in cases where liability is hotly contested "employing the reverse bifurcation procedure to preclude the jury from considering evidence that the products at issue could not have caused the plaintiff's injuries until after damages already have been awarded is highly prejudicial." Dana's Brief, at 43. Dana further submits that "prejudice becomes even more acute when the plaintiff's evidence of injury is stronger than the liability evidence...." *Id.* In essence, Dana asserts that the jury had already reached its conclusion as to Dana's liability by the conclusion of Phase I.

¶ 68 In rejecting a similar claim in *Donoughe*, the panel noted:

this is a wholly unsubstantiated allegation that is not deducible from anything of record. Moreover, Lincoln and Hobart were fully able to present their evidence during Phase II, following Donoughe's more detailed evidence of exposure to asbestos shed from their products. Phase II was when the jury was asked to determine which, if any, of the many defendants were liable for Donoughe's asbestos-related injuries established during Phase I. Thus, there is

---

a plumber's or pipefitter's helper is not also an intended user.

22. In *Donoughe, supra,* this Court rejected a nearly identical argument stating: "Lincoln and Hobart also argue that the reverse bifurcated trial violated their constitutional rights

to due process and a fair jury trial. This argument is based on the allegation that they were deprived of an 'opportunity to be heard.' This argument is plainly, wholly, and indisputably without merit." *Id.* 936 A.2d at 71 n. 21 (citations omitted).

simply no basis to conclude that Lincoln's and Hobart's defense was hampered or prejudiced by being raised at the liability stage of the proceedings any more than if the trial had not been bifurcated. The parties participated in a **single** bifurcated trial, not two trials where Lincoln and Hobart were found liable each time.

*Donoughe,* 936 A.2d at 71. We find that the same rationale is equally applicable in this case, and Dana was not hampered in presenting its defense. Moreover, we find Dana's argument in this regard is premised upon the same misconception, which underlies many of Dana's arguments in this appeal, that its product was not capable of causing injury. For all of the reasons discussed above, we find that Dana has failed to establish that the trial court abused its discretion in deciding to utilize the reverse-bifurcation procedure. Thus, this claim warrants no relief.

¶ 69 Accordingly, for the above-stated reasons, we affirm the judgment entered in favor of Appellee.

¶ 70 Judgment affirmed.

¶ 71 KLEIN, J. files a Concurring Opinion.

## CONCURRING OPINION BY KLEIN, J.:

¶ 1 I agree with the majority that:

1. Plaintiff presented enough evidence of exposure to defendants' products to sustain a verdict. Although the amount of exposure to defendants' products is less than other types of asbestos-containing products, because of the prolonged exposure to the product and the smaller dosage

necessary to cause mesothelioma, the evidence is still sufficient.

2. The evidence of EPA and OSHA regulations was properly excluded.

3. The case should not be reversed for the trial court's factual causation charge because what might have been significant objections to the charge were not made and should be considered waived.

¶ 2 I write separately to note that first, following the Pennsylvania Supreme Court opinion in *Gregg v. V–J Auto Parts, Company,* 596 Pa. 274, 943 A.2d 216 (2007), the testimony of Plaintiff's expert, James C. Giudice, that "each and every exposure [to asbestos fibers] is significant in the causation of this malignancy, mesothelioma, by the asbestos"[1] was improperly admitted. However, there was no objection to this testimony at trial, so this issue is waived.[2]

¶ 3 Second, particularly under the circumstances of this case, I believe the charge on "factual cause" was improper. All the judge said was that something is a "factual cause" if the harm would not have occurred without exposure to the defendants' defective product. I note that while this part of the Pennsylvania Suggested Standard Civil Jury Instruction on factual cause was read, a major part was omitted, leaving the resulting charge incomplete and confusing. However, no objection was made to the reading of this part of the charge, so although it might have been reversible error, any error is waived.

### 1. The "each and every" breath testimony.

¶ 4 In his deposition for the "causation" phase of the reverse-bifurcated trial, Phase II, Plaintiff's medical expert, Dr. Giudice, testified:

---

1. Deposition of James C. Giudice, D.O., "Phase II," June 8, 2004, at 29–30, R.R. 1305.

2. Perhaps for this reason, as the majority notes, this issue was not raised on appeal so is not before us.

It's my opinion that each and every exposure is significant in the causation of this malignancy, mesothelioma, by the asbestos. And the reason that each and every exposure is significant is that each and every exposure adds to the asbestos burden. And as—has been—as I've described previously, the more asbestos that accumulates, the more significant or the risk for mesothelioma and the higher incidence of that malignancy. That's one thing we do know. We do know that the more asbestos that collects, the more—more significant the incidence— the number of mesotheliomas will increase. What we don't know is how that occurs. And so, each and every asbestos fiber that's inhaled contributes to the asbestos burden—that contributes to the asbestos burden is a causative factor in the development of this malignancy.[3]

¶ 5 This is precisely the kind of testimony the Pennsylvania Supreme Court found inappropriate in *Gregg*, quoting this judge's statement in *Summers v. Certainteed Corp.*, 886 A.2d 240 (Pa.Super.2005). The Supreme Court said:

We recognize that it is common for plaintiffs to submit expert affidavits attesting that any exposure to asbestos, no matter how minimal, is a substantial contributing factor in asbestos cases. However, we share Judge Klein's perspective, as expressed in the *Summers* decision, that such generalized opinions do not suffice to create a jury question in a case where exposure to the defendant's product is *de minimus*, particularly in the absence of evidence excluding other possible sources of exposure (or in the fact of evidence of substantial exposure from other sources). *See,*

*Summers*, 886 A.2d at 244; *accord Lindstrom*,[4] 424 F.3d at 493 (reasoning that if such an opinion were permitted to control, the substantial factor test would be rendered meaningless).

*Gregg*, 943 A.2d at 226.

¶ 6 The testimony of an expert physician as to legal causation is beyond the physician's expertise and improperly invades the province of the jury as guided by the judge. Therefore, we now know that this testimony should not have been admitted.

¶ 7 However, although an objection was made at the videotape deposition, a review of the record shows that this objection was not renewed before the trial judge, nor was it raised in this appeal. *See* N.T. Trial, 6/15/04, at 3–7; R.R. 345.3–.7. Accordingly, while the argument has merit, it is not before us.

## 2. The "factual cause" charge.

¶ 8 The trial judge recharged the jury on "factual cause" after some issues with the initial charge as to whether the judge charged that the "conduct" had to cause the harm. The charge on factual cause finally read was:

If you find that the product was defective, the defendant is liable for all harm caused by such defective condition. A defective condition is the factual cause of the harm if the harm would not have occurred absent the defect. In order for the plaintiff to recover in this case, the defendant's defect must have been a factual cause of the plaintiff's mesothelioma.[5]

The trial judge then asked, "Any additions or corrections to the reading of that?" and

---

**3.** "Phase II" Deposition of James C. Giudice, D.O., 6/8/04, at 29–30; R.R. 1305.

**4.** *Lindstrom v. A–C Product Liability Trust,* 424 F.3d 488 (6th Cir.2005).

**5.** N.T. Trial, 6/24/04, at 51; R.R. 1015.165.

all counsel said "no." Therefore, any complaints that the "actual, real" factor was omitted and any complaints that there was no charge on concurrent causation have been waived.

¶ 9 I note that the draft standard charge then in effect, and similar to some of the wording of the current version, adds the language that:

Therefore, in determining factual cause, you must decide whether the negligent conduct of the defendant was more than an insignificant factor in bringing about any harm to the plaintiff. Under Pennsylvania law, conduct can be found to be a contributing factor if the action or omission alleged to have caused the harm was an actual, real factor, not a negligible, imaginary or fanciful factor, or a factor having no connection or only an insignificant connection with the injury. However, factual cause does not mean it is the only, primary or even the most important factor in causing the injury. A cause may be found to be a factual cause as long as it contributes to the injury in a way that is not minimal or insignificant.

To be a contributing factor, the defendant's conduct need not be the only factor. The fact that some other causes concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as [his][her] own negligence is a factual cause of the injury.

The negligence of a defendant may be found to be a factual cause of plaintiff's harm even though it was relatively minor as compared to the negligence of [the other defendant or] the plaintiff. In effect, the test for factual causation has been met when the conduct in question has such an effect in producing the harm as to lead reasonable persons to regard it as one of the [contributing causes that is neither insignificant nor inconsequential considering all the circumstances.] [6]

¶ 10 In a similar situation in *Gorman v. Costello*, 929 A.2d 1208, 1213 (Pa.Super.2007), this Court held that "when juries are given incomplete instructions, a new trial is required." Because the trial court in *Gorman* only gave the "but for" portion of the charge, this Court held that the charge was inadequate and remanded for a new trial.[7]

¶ 11 However, a careful review of the record shows that no objection to the charge was made on *this* basis, so this argument is waived. Objections were made to the further portion of the charge stating that there is no particular amount of fibers or composition of fibers that is required. *That* part of the charge was correct. Likewise, there was discussion about applying the burden of proof to settled defendants. Since there was no objection to the "factual cause" portion of the charge, although the charge may have been incomplete and therefore erroneous, no objection on this ground was preserved.

6. SSJI (Civ) § 3.25 (2003). Of course, the language would have to be modified for a product liability case.

7. I note that the new Section 3.15 of the 2008 Supplement of Pennsylvania Suggested Standard Civil Jury Instructions eliminates some of the language in the earlier draft. However, I am not certain that the new charge comports with Supreme Court law. The new suggested charge does say that "A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm" and does say that the harm "would not have occurred absent the conduct." SSJI (Civ) § 3.15 (2008). However, I believe the absence of a fuller discussion may result in an incomplete charge and caution trial judges to use the new charge at their peril.

¶ 12 Because of the waiver of these significant issues, I concur in the result.